Matthew L. Rollin (SBN 332631)
**SRIPLAW, P.A.**
8730 Wilshire Boulevard
Suite 350
Beverly Hills, California 90211
323.452.5600 – Telephone
561.404.4353 – Facsimile
matthew.rollin@sriplaw.com

Counsel for Plaintiff
Viral DRM LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VIRAL DRM LLC, | CASE NO.: |
| Plaintiffs, | **DECLARATION OF BRANDON CLEMENT** |
| v. | |
| YOUTUBE UPLOADERS LISTED ON SCHEDULE A, | |
| Defendant. | |

I, Brandon Clement, declare and say:

1. I am a principal and one of the owners of Viral DRM LLC. Viral DRM is an Alabama limited liability company that helps clients protect the copyright to video content, especially content depicting extreme weather events. I am also CEO of WXchasing LLC a Mississippi limited liability company. Both companies are affiliated with Live Storms Media LLC, an Alabama limited liability company that acts as a licensing broker of video content owned by or exclusively licensed to Viral DRM and WXchasing.

2. WXchasing and Live Storms Media own or exclusively license more than 125 million minutes of video. Viral DRM's largest customers, and those of its affiliates WXchasing and Live Storms Media, are Weather.com, The Weather Channel, and CNN. All three of these customers are three of the largest media outlets for extreme weather video content in the U.S.

1

3. Weather.com, The Weather Channel, and CNN have all licensed at least some of the copyrighted works at issue in this case. Moreover, Weather.com has a blanket license covering all the content on Live Storms Media's YouTube channel which includes some of the copyrighted works at issue in this case.

4. Both Live Storms Media and WXchasing operate popular and valuable YouTube channels on the YouTube platform. As of the date of this declaration:

   a. Live Storms Media had over 350,000 subscribers and over 19,000 videos on its YouTube channel; the most popular Live Storms Media video had over 9 million views; and

   b. WXchasing had over 65,000 subscribers and over 475 videos on its YouTube channel; the most popular WXchasing video had over 6.5 million views.

5. I am a storm chaser specializing in shooting viral video for broadcast and distribution. In 1995 at the age of 15, I tracked Hurricane Opal along the Florida Gulf Coast to officially "chase" my first hurricane. As I got older, I continued to chase after regional tropical systems and localized flooding events. In 1997, I moved to central Mississippi where I graduated high school and attended community college. In the fall of 1998 when a tornado warning prompted faculty at Hinds Community College to herd students in the hallways, I opted to leave and chased the storm in my car for more than 70 miles.

6. I have captured many tornadoes, hurricanes and other severe weather events including the April 27, 2011, Super Outbreak where we captured some of the only footage of the Smithville, MS EF5 tornado. In 2016, I agreed to consult for WeatherNationTV and began capturing tornadoes just about every day. My footage of the 2016 Louisiana flooding was shown worldwide. In 2017, I dedicated myself full-time to storm videography. That same year I founded WXchasing, my production company that creates some of the videographic works that Viral DRM syndicates and licenses. In 2017 I also became a certified drone pilot.

7. In 2017, after the longest hurricane drought in US history, I returned to hurricane chasing and rode out Hurricane Harvey—a nighttime strengthening category 4 hurricane—in my car on a highway in Rockport, Texas. My live stream received over 6 million views in a matter of hours

SRIPLAW
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

and was widely considered one of the most intense live stream storm events ever seen. WXChasing began to rapidly grow and showcased my ability to capture amazing video and get it to the media quickly. Just weeks later, during Hurricane Irma, I was the first person to ever fly a drone in the eye of a hurricane.

8. In 2018, my videos of the Kilauea Volcano erupting in Hawaii went viral worldwide. My timelapse of lava consuming a Ford Mustang was one of the most viewed videos on the internet in 2018. Later that year, my coverage of Hurricane Michael garnered me even more recognition. In 2019, I became the first person ever to get close range footage of a tornado with a drone as I flew my drone just yards away from a tornado in Oklahoma. Just a month later I did it again near Canton, Texas capturing a much stronger tornado hitting homes.

9. The YouTube channel for Live Storms Media has earned over 350,000 followers on YouTube. Videos on Live Storms Media have received well over 15 billion views in the US across social media platforms, digital, apps and broadcast. WXchasing and Live Storms Media own or exclusively license more than 125 million minutes of video. Viral DRM represents my work and the work of numerous other award-winning videographers and storm chasers who make their living from their creativity and the risks they take shooting extreme events around the globe.

10. YouTube channels and Facebook pages that display our content are extremely popular destinations for viewers seeking extreme weather event footage. My experience operating these channels/pages has taught me how these outlets operate and pay channel operators for their content. My experience has also informed my efforts to combat the widespread video piracy that my companies and its creators fall victim to on a daily basis.

11. The works at issue in this case are listed on Schedule A to the complaint. I am familiar with each and every work listed on Schedule A. All the works are original works of authorship created by me or by one of the other authors/creators listed on Schedule A. All the works are exclusively licensed to Viral DRM for distribution and syndication pursuant to written agreements that provide Viral DRM with the necessary rights to sue for the infringements at issue in this case. Many of the works at issue in this case listed on Schedule A contained watermarks and

3

1  embedded metadata copyright management information identifying them as the property of
2  WXchasing, Viral DRM or the video's creators.

3      12.    All the works at issue in this case are valuable for displaying on YouTube and
4  Facebook. All the works at issue show dramatic weather events that make for compelling and
5  interesting viewing by interested viewers worldwide. All the works at issue also can be used to earn
6  money from advertising on YouTube. That is why the defendants listed on Schedule A to the
7  complaint copied the works.

8      13.    The defendants listed on Schedule A are YouTube uploaders whose identities were all
9  falsified on YouTube. The true identities of the defendants had to be obtained by subpoena from
10 Google, LLC pursuant to 17 U.S.C. § 512(h) in the companion miscellaneous case 2023-mi-00012.
11 Google, LLC's response to the subpoena issued by this court in the companion miscellaneous case
12 2023-mi-00012 revealed that the identifying information defendants provided in their counternotices
13 attached to the complaint as Exhibit 4 was false information.

14     14.    Attached as Exhibit 1 to this declaration is a list showing the defendants' YouTube
15 channel names, links to their channels, the number of subscribers, the number of videos, and the
16 number of views for the defendants' most popular videos. The information in Exhibit 1 is valid as of
17 the filing of the complaint in this case. Several of the defendants have had their channels removed
18 from YouTube due to repeated infringement since this case was originally filed for reasons
19 explained below. For all the defendants but one who have channels on YouTube, those channels are
20 extremely popular and valuable with over 100,000 subscribers, numerous videos, and videos with
21 over 100,000 views or more. These are very valuable YouTube channels that earn significant
22 revenue from the display of pirated video content.

23     15.    All the defendants listed on Schedule A to the complaint monetized the videos they
24 stole from Viral DRM. Monetizing videos on YouTube involves enabling advertisements to be
25 displayed on your videos, which allows you to earn money through the YouTube Partner Program.
26 The process works like this:

27
28

4

      a.      Eligibility: To monetize your videos, you need to meet certain eligibility criteria set by YouTube. You have to have at least 1,000 subscribers on your channel and a total of 4,000 watch hours in the past 12 months.

      b.      Joining the YouTube Partner Program: Once you meet the eligibility requirements, you can apply to join the YouTube Partner Program (YPP). This program allows you to monetize your videos by enabling ads on them. If your application is approved, you gain access to various monetization features.

      c.      Ad Formats: YouTube offers different ad formats that can appear on your videos, including pre-roll ads (shown before your video starts), mid-roll ads (shown during longer videos), and display ads (overlayed on the video or beside it). The specific types of ads displayed on your videos may depend on factors like the viewer's location and the advertiser's targeting preferences.

      d.      Revenue Sharing: When ads are displayed on your videos, you earn a portion of the revenue generated by those ads. The exact revenue split varies, but generally, creators receive around 55% of the ad revenue, while YouTube retains the remaining 45%. The revenue is based on factors such as the number of ad impressions, viewer engagement, and the advertisers' bidding.

      e.      AdSense Account: To receive payments for your YouTube earnings, you need to have an AdSense account linked to your YouTube channel. AdSense is a program by Google that allows publishers (in this case, YouTube creators) to earn money from ads. Once your AdSense account is set up and linked to your YouTube channel, you can manage your earnings and payment settings.

      f.      Payment Threshold: YouTube pays creators once they reach a payment threshold, which is typically $100. Once your earnings exceed this threshold, you become eligible for payment. YouTube offers various payment methods, such as direct deposit or wire transfer, depending on your country.

   g. Other Revenue Streams: While ad revenue is a significant way to monetize your YouTube channel, creators often explore other revenue streams as well. These can include brand partnerships, sponsorships, merchandise sales, crowdfunding, and more.

16. My company's Live Storms Media YouTube channel and Facebook page displays videos of extreme weather events that are frequently copied, downloaded, and reuploaded by infringers. We are a popular and frequent source of footage of weather events that cannot be obtained elsewhere. This makes us a frequent target for infringers and pirates. As a result, my experience has informed my efforts to combat the widespread video piracy that my companies and its creators fall victim to on a daily basis.

17. The defendants listed on Schedule A had access to and downloaded Viral DRM's copyrighted works from Viral DRM's affiliated Live Storms Media YouTube channels or Facebook pages online. It is easy to download videos from YouTube and Facebook; there are numerous free and low-cost tools available online that a downloader can use to copy and download video content. Just search "download YouTube videos" on Google. These tools are easy to find and they make copyright infringement easy and frictionless for video pirates.

18. Once downloaded, video pirates can edit pirated videos easily using online and free video editing tools that can remove or crop out proprietary watermarks and metadata that we place in our videos to identify and associate them with WXChasing, Viral DRM, Live Storms Media, or our creators. After editing the pirated videos, video pirates can combine our videos with other video content that they either stole from others or created themselves and then reupload the resulting video to their YouTube channels and enabled advertising on them to earn monetization revenue.

19. The defendants identified on Schedule A to the complaint each infringed at least three of Viral DRM's copyrighted works as shown on Schedule A. The defendants identified on Schedule A all downloaded and copied Viral DRM's copyrighted works identified on Schedule A. The defendants identified on Schedule A all edited, cropped or altered Viral DRM's copyrighted works shown on Schedule A. When they edited Viral DRM's copyrighted works shown on Schedule A, the defendants removed or altered Viral DRM's copyright management information watermarks. The defendants listed on Schedule A to the complaint then reuploaded the resulting videos they

created using Viral DRM's copyrighted works to their YouTube channels and enabled advertising on them to earn monetization revenue. When the defendants reuploaded the videos they created using Viral DRM's copyrighted works they falsely claim to be the creators or owners of the videos on their channels.

20. Because my companies' videos are a frequent target for infringers and pirates, I have learned how to police the infringement of our videos online, including how to use the DMCA (Digital Millennium Copyright Act) takedown and strikes process on YouTube. This is a system that allows copyright holders to protect their content and request the removal of infringing material from the platform. Here's an overview of how the process works:

    a. Copyright Holder Identification: The copyright holder identifies their content that has been uploaded to YouTube without authorization. This could include songs, videos, images, or any other form of copyrighted material.

    b. Submitting a DMCA Takedown Notice: The copyright holder, or their designated agent, submits a formal DMCA takedown notice to YouTube. This notice contains specific information, including the identification of the copyrighted work, the location of the infringing material on YouTube (such as a URL), and a statement affirming that the copyright holder has a good faith belief that the use is unauthorized.

    c. YouTube's Review: Upon receiving a valid DMCA takedown notice, YouTube reviews the notice to ensure it meets the legal requirements outlined in the DMCA. They verify the information provided and evaluate whether the material in question infringes on copyright.

    d. Content Removal: If YouTube determines that the content is infringing, they remove or disable access to the material as specified in the DMCA notice. They also notify the user who uploaded the content (the alleged infringer) about the takedown and provide them with an opportunity to respond.

    e. Counter Notification: If the uploader believes their content was wrongly removed, they can submit a counter notification to YouTube. This notification includes their

contact information, a statement under penalty of perjury that they have a good faith belief the material was removed due to a mistake, and consent to jurisdiction in a federal court.

   f. Restoring the Content: If the uploader submits a valid counter notification, YouTube may restore the removed content after a specified waiting period (usually 10-14 business days) unless the copyright holder takes legal action against the uploader.

 21. All of the works at issue in this case listed on Schedule A to the complaint were discovered on the defendants' YouTube channels in videos that the defendants uploaded to YouTube. Exhibit 2 to my declaration contains a schedule showing the dates when Viral DRM first discovered the pirated videos on YouTube, the location where the videos were discovered, and the time stamps where the videos were reproduced if they were edited into a larger video compilation which occurred with most of Viral DRM's videos.

 22. Based on my experience I know that by uploading content to YouTube, you are implicitly declaring that you have the necessary rights or permissions to distribute and share that content. YouTube's Terms of Service state that users must only upload content to which they have the necessary rights. This means that you should not upload copyrighted material unless you have obtained permission from the copyright holder or your use of the material falls within a legally recognized exception, such as fair use. If a video receives a copyright claim or takedown notice, YouTube requires the user to provide evidence that the user has the necessary rights to use the copyrighted material.

 23. After discovering the videos listed on Schedule A to the complaint on the dates indicated in Exhibit 2, Viral DRM followed the DMCA takedown process described above and submitted takedowns to YouTube. True and correct copies of the DMCA takedowns submitted to YouTube by Viral DRM are attached to the complaint as Exhibit 3. In response to all the takedowns submitted, the defendants listed on Schedule A all submitted false and misleading counternotices in which they claimed to have the rights to display Viral DRM's videos on YouTube. None of the defendants had authorization from Viral DRM to display its videos. None of the defendants had valid bases to claim the content was wrongfully removed. None of the defendants could have had valid good faith beliefs that the material was removed due to a mistake.

24.     The defendants' counternotices are not just misleading, they are false and fraudulent. Several different defendants listed on Schedule A to the complaint gave the same false contact information even though they are different individuals who reside in different countries. Several different defendants listed on Schedule A to the complaint also provided the same false and bad faith explanations in their counternotices why they claimed that they had valid bases to claim that the content identified in Viral DRM's DMCA notices was wrongfully removed. This indicates that the defendants are acting in concert with each other in operating their YouTube channels and pirating Viral DRM's video content.

25.     Based on my experience monetizing video content on YouTube, the defendants listed on Schedule A to the complaint have earned Millions of dollars from monetizing pirated videos including Viral DRM's videos. The defendants had no right to earn money from pirated content. In order to obtain an accounting and disgorgement of the defendants' profits from their illegal piracy of Viral DRM's videos, Viral DRM needs to obtain information from YouTube (Google) on the amount of money the defendants earned in advertising revenue from videos posted on their YouTube channels. Viral DRM cannot obtain that information without a court order.

26.     Unauthorized YouTube uploaders like defendants have harmed us in the past and will harm us in the future in several ways:

    a.     Loss of Revenue: One of the primary ways Viral DRM makes money is through monetization on platforms like YouTube and Facebook. By uploading and monetizing copyright infringing videos, defendants diverted potential revenue that should rightfully go to Viral DRM. This has resulted in significant financial losses for Viral DRM, especially because the infringing videos have gained popularity and generated substantial ad revenue or views.

    b.     Dilution of Brand and Reputation: Unauthorized uploads harmed Viral DRM's and its affiliated companies' brand and reputation. If the infringing videos misrepresent or distort the original content—like the defendants' uploaded compilations do— it confused viewers and created negative associations with the producer's brand. This can

1   undermine our credibility and impacted our ability to attract sponsors, partners, or viewers in
2   the long run.
3          c.      Competition and Audience Fragmentation: Unauthorized uploads created a
4   fragmented audience base. With multiple copies of the same video existing on YouTube,
5   viewership and engagement were divided among different uploads. This diluted the
6   producer's potential audience, making it harder to gather a significant following or maintain a
7   loyal fan base. It also impeded our ability to build a cohesive online presence and engage
8   with our viewers effectively.
9          d.      Loss of Control and Creative Intent: When unauthorized uploaders monetized
10  copyright infringing videos, they did so without our consent which means we lost control
11  over how our content was distributed, presented, and associated with advertisements or
12  sponsors. It undermined our ability to protect our creative vision, maintain quality standards,
13  and ensure that our content is being used in a manner consistent with our intentions.
14         e.      Legal Complexities and Costs: Dealing with copyright infringement issues is
15  legally complex and expensive. Viral DRM has been forced to invest time and resources in
16  identifying and reporting the infringing content to YouTube or taking legal action against the
17  unauthorized uploaders. These processes are time-consuming, divert attention from other
18  productive endeavors, and involve legal fees, all of which can further harm our financial
19  well-being.
20  27.    Unauthorized YouTube uploads of copyright infringing videos have significantly
21  harmed us by undermining our revenue streams, diluting our brand and reputation, fragmenting our
22  audience, compromising our creative control, and imposing legal complexities and costs.
23  28.    All of the defendants are located outside of the United States. I am legitimately
24  concerned that the defendants will abscond with their ill-gotten gains from monetizing pirated videos
25  on YouTube unless this Court orders their Google AdSense accounts frozen and also freezes the
26  defendants' funds transferred from their Google AdSense accounts in the possession of or
27  transmitted through electronic funds transfer services, foreign banks and domestic banks, payment
28

1  service providers and money transfer services that defendants use to transfer funds to themselves or
2  others from their Google Adsense accounts.
3      I declare under perjury under the laws of the United States of America that the foregoing is
4  true and correct.

6  Executed on August 22, 2023.

*Michael Brandon Clement*

BRANDON CLEMENT

Verified by signNow
08/23/2023 09:35:25 UTC
0bdc3f5e4e7c48719c8d

SRIPLAW
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK